81 F.3d 160
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Janice HEINZ and Susan McGee, Plaintiffs-Appellants,
v.
PHOENIX CORPORATION, Defendant-Appellee.
 No. 94-6394.
 United States Court of Appeals, Sixth Circuit.
 March 20, 1996.
 
 Before: NELSON and BATCHELDER, Circuit Judges, and KATZ, District Judge.[1]
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 A contract under which Calumet Farm, Inc., purchased a certain thoroughbred stallion in 1988 contained a provision entitling each of the appellants to make one free "nomination" per breeding season for as long as the horse lived. Without having to pay a stud fee, the contract provided, each appellant could annually designate a qualified mare to be bred to the stallion.
 
 
 2
 Calumet (the name of which was later changed to Phoenix Corporation) filed a petition for relief under chapter 11 of the Bankruptcy Code in 1991. As debtor-in-possession, Calumet/Phoenix then commenced an adversary proceeding seeking a declaration that the stallion could be sold free and clear of the appellants' breeding rights.
 
 
 3
 The bankruptcy court (Lee, C.J.) granted the relief sought, concluding that the breeding rights did not rise to the level of ownership interests in the stallion itself. The bankruptcy court viewed the appellants as beneficiaries of a service contract, so to speak. As such the appellants were entitled to assert unsecured claims against the debtor's estate for breach of performance, but were held not to be entitled to share as owners in the value realized when the debtor-in-possession sold the horse.
 
 
 4
 The decision of the bankruptcy court was affirmed by the district court (Wilhoit, J.) on appeal. An appeal to this court followed. We find no error in the district court's affirmance of the bankruptcy court's resolution of the ownership issue, and we shall affirm the order appealed from.
 
 
 5
 * Calumet's vendor--a Canadian corporation called Northern Equine Thoroughbred Production, Ltd.--represented in the contract that it was "the present owner of the entire interest in and to the thoroughbred colt TALINUM...." The contract set the purchase price at $3.6 million, payable over a period of time. Northern Equine was to deliver Talinum to Calumet Farm on or before December 24, 1988, to stand at stud under the terms of the contract. The contract further specified that title and risk of loss would pass to Calumet upon delivery, provided that certain insurance was in effect. Calumet granted Northern Equine a lien to secure payment of the purchase price, but the lien was not perfected by the filing of the necessary financing statement.
 
 
 6
 Calumet and Northern Equine agreed in the contract that certain third parties would receive "transferable free breeding rights," each such breeding right to consist of "one (1) nomination per breeding season[2] during the lifetime of the Thoroughbred without cost...." Among the recipients of these breeding rights were the appellants, both former Calumet employees, who received one such right apiece. Although the appellants were not parties to the contract, it is undisputed that but for the bankruptcy they could have maintained a suit for specific performance in the event of a wrongful failure to honor nominations submitted in accordance with the contract.
 
 II
 
 7
 On its face, the contract appears to provide that Northern Equine's 100 percent ownership interest was to be purchased by Calumet. The ownership interest was not split into fractional interests or "shares," as that term is customarily used in Kentucky equine law. Calumet undertook to let the appellants breed mares to the stallion without cost, but the contract, as we read it, does not reflect an understanding that ownership of the stallion would be divided among Calumet and the persons to whom breeding rights were given. The appellants tell us, indeed, that they "do not and have not claimed to own TALINUM the animal."
 
 
 8
 Citing North Ridge Farms, Inc. v. Trimble, 37 U.C.C.Rep.Serv. 1280, 1983 WL 160534 (Ky.App.1983), aff'd, 700 S.W.2d 396 (Ky.1985), and First City, Texas-Houston, N.A. v. Due Process Stables, No. 92-268 (E.D.Ky., March 31, 1993) (Wilhoit, J.), the appellants argue that equine breeding rights are property, just as the horse itself is. The debtor-in-possession does not dispute this proposition--a proposition with which the district court had no difficulty either--but the debtor argues that the property is a contract right against the owner of the horse, not a lien upon the horse or an ownership interest in it. We find the debtor's argument persuasive.
 
 
 9
 In Calumet Farm, Inc. v. Revenue Cabinet, Commonwealth of Kentucky, 793 S.W.2d 830, 831 (Ky.App.1990), the Kentucky Court of Appeals held that purchasers of lifetime breeding rights in the stallion Alydar "acquired no interest in the horse itself, but only an interest in the breeding rights of the animal." The court expressly rejected an argument that a lifetime breeding right is substantially equivalent to a "share" in the horse.
 
 
 10
 It is true that the Alydar contract expressly provided that the purchaser of a breeding right would not ipso facto become the owner of a fractional interest in the stallion, while no corresponding provision is to be found in the contract under which Calumet acquired Talinum. As we have already seen, however, the Talinum contract did not divide the ownership of the horse into shares; it conveyed the entire ownership interest to Calumet, and it subjected Calumet to executory contractual obligations indistinguishable, in any meaningful sense, from the contractual obligations assumed by Calumet under the Alydar contract. The Kentucky Court of Appeals decision thus provides strong support for the conclusion reached by the bankruptcy and district courts here.
 
 
 11
 It does not appear to us that this support is undermined by the fact that the state court case involved the applicability of a tax. In order to decide whether the tax applied, the Kentucky Court of Appeals had to decide whether the purchaser of lifetime breeding rights acquired an interest or share in the horse itself. We see no justification for concluding that the recipient of a lifetime breeding right does not acquire an interest or share in the horse for tax purposes, but does acquire such an interest or share for bankruptcy purposes. What the appellants in this proceeding acquired was a promise by the owner of Talinum to have the stallion service mares nominated on the terms set forth in the contract. Such a promise, while undoubtedly a property right, gives the promisee no property in the stallion.
 
 
 12
 Our conclusion finds additional support in North Ridge Farms, Inc. v. Trimble, supra. There the owner of a stallion "syndicated" the horse, dividing ownership of the animal into 36 shares. The shareowners possessed breeding rights, but as tenants in common they also had the power to manage the horse and the obligation to pay its expenses. It was their horse, in contemplation of law, and not anyone else's. An individual shareowner, the Kentucky Court of Appeals held, had "not merely a right to breed for successive annual seasons[,] but a partial interest in goods."
 
 
 13
 The North Ridge court went on to hold that under the Uniform Commercial Code, a shareowner's sale of a season's breeding right was not a sale of "goods." Sale of the one-season breeding right--classifiable as a "general intangible" under the U.C.C.--"conveyed nothing more than the right to breed the horse during that limited time period; it conveyed no actual ownership interest or fractional interest." (Emphasis supplied.) When an annual breeding season is sold apart from the fractional interest, in other words, "it ceases to be goods." The Kentucky Court of Appeals did not think that the breeding right precisely met the statutory definition of a "contract right," but the court squarely held that sale of a breeding right is not tantamount to sale of a fractional ownership interest in the horse.
 
 
 14
 The appellants contend that North Ridge supports their position because it shows that breeding rights are property that can be severed from the title to and possessory interest in the stallion. But no one denies that breeding rights are property, just as any other chose in action is property. The question is whether breeding rights constitute property in the horse--and like the courts below, we believe that Kentucky law requires this question to be answered in the negative.
 
 
 15
 The debtor-in-possession argues in the alternative that under 11 U.S.C. § 551 it has a purchase money security interest in Talinum that entitles it to foreclose any other interests in the horse. Because we conclude that the appellants had no interest in the horse, we need not and do not decide the § 551 issue.
 
 
 16
 For the reasons stated, and for substantially all of the reasons given by Judges Lee and Wilhoit on the issue that we find dispositive, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [2]
 The thoroughbred breeding season, we are told, begins on February 15 and ends on June 15 of each year